# SUPREME COURT OF THE UNITED STATES

BOBBY JAMES MOORE *v.* TEXAS

ON PETITION FOR WRIT OF CERTIORARI TO THE COURT OF
CRIMINAL APPEALS OF TEXAS

No. 18–443.   Decided February 19, 2019

PER CURIAM.

In 2015, the Texas Court of Criminal Appeals held that petitioner, Bobby James Moore, did *not* have intellectual disability and consequently was eligible for the death penalty. *Ex parte Moore*, 470 S. W. 3d 481, 527–528 (*Ex parte Moore I*). We previously considered the lawfulness of that determination, vacated the appeals court's decision, and remanded the case for further consideration of the issue. *Moore* v. *Texas*, 581 U. S. ___, ___ (2017) (slip op., at 18). The appeals court subsequently reconsidered the matter but reached the same conclusion. *Ex parte Moore*, 548 S. W. 3d 552, 573 (Tex. Crim. App. 2018) (*Ex parte Moore II*). We again review its decision, and we reverse its determination.

I

When we first heard this case, in *Moore*, we noted that the state trial court (a state habeas court) "received affidavits and heard testimony from Moore's family members, former counsel, and a number of court-appointed mental-health experts." 581 U. S., at ___ (slip op., at 3). We described the evidence as "reveal[ing]" the following:

 "Moore had significant mental and social difficulties beginning at an early age. At 13, Moore lacked basic understanding of the days of the week, the months of the year, and the seasons; he could scarcely tell time or comprehend the standards of measure or the basic principle that subtraction is the reverse of addition. At school, because of his limited ability to read and

write, Moore could not keep up with lessons.  Often,
he was separated from the rest of the class and told to
draw pictures.  Moore's father, teachers, and peers
called him 'stupid' for his slow reading and speech.
After failing every subject in the ninth grade, Moore
dropped out of high school.  Cast out of his home, he
survived on the streets, eating from trash cans, even
after two bouts of food poisoning."  *Ibid.* (citations
omitted).

On the basis of this and other evidence, the trial court
found that Moore had intellectual disability and thus was
ineligible for the death penalty under *Atkins* v. *Virginia*,
536 U. S. 304 (2002).  App. to Pet. for Cert. 310a–311a.
The Texas Court of Criminal Appeals reversed that de-
termination, *Ex parte Moore I*, 470 S. W. 3d 481, and we
reviewed its decision, *Moore*, 581 U. S. ___.

At the outset of our opinion, we recognized as valid the
three underlying legal criteria that both the trial court
and appeals court had applied.  *Id.*, at ___–___ (slip op., at
3–4) (citing American Association on Intellectual and
Developmental Disabilities, Intellectual Disability: Defini-
tion, Classification, and Systems of Supports (11th ed.
2010) (AAIDD–11); American Psychiatric Association,
Diagnostic and Statistical Manual of Mental Disorders
(5th ed. 2013) (DSM–5)).  To make a finding of intellectual
disability, a court must see: (1) deficits in intellectual
functioning—primarily a test-related criterion, see DSM–
5, at 37; (2) adaptive deficits, "assessed using both clinical
evaluation and individualized . . . measures," *ibid.*; and (3)
the onset of these deficits while the defendant was still a
minor, *id.*, at 38.  With respect to the first criterion, we
wrote that Moore's intellectual testing indicated his was a
borderline case, but that he had demonstrated sufficient
intellectual-functioning deficits to require consideration of
the second criterion—adaptive functioning.  *Moore*, 581

U. S., at \_\_\_–\_\_\_ (slip op., at 10–12). With respect to the third criterion, we found general agreement that any onset took place when Moore was a minor. *Id.*, at \_\_\_, n. 3 (slip op., at 4, n. 3).

But there was significant disagreement between the state courts about whether Moore had the adaptive deficits needed for intellectual disability. "In determining the significance of adaptive deficits, clinicians look to whether an individual's adaptive performance falls two or more standard deviations below the mean in any of the three adaptive skill sets (conceptual, social, and practical)." *Id.*, at \_\_\_ (slip op., at 4) (citing AAIDD–11, at 43). Based on the evidence before it, the trial court found that "Moore's performance fell roughly two standard deviations below the mean in *all three* skill categories." 581 U. S., at \_\_\_ (slip op., at 4); see App. to Pet. for Cert. 309a. Reversing that decision, the appeals court held that Moore had "not proven by a preponderance of the evidence" that he possessed the requisite adaptive deficits, and thus was eligible for the death penalty. *Ex parte Moore I*, 470 S. W. 3d, at 520. We disagreed with the appeals court's adaptive-functioning analysis, however, and identified at least five errors.

First, the Texas Court of Criminal Appeals "overemphasized Moore's perceived adaptive strengths." *Moore*, 581 U. S., at \_\_\_ (slip op., at 12). "But the medical community," we said, "focuses the adaptive-functioning inquiry on adaptive *deficits." Ibid.*

Second, the appeals court "stressed Moore's improved behavior in prison." *Id.*, at \_\_\_ (slip op., at 13). But "[c]linicians . . . caution against reliance on adaptive strengths developed 'in a controlled setting,' as a prison surely is." *Ibid.* (quoting DSM–5, at 38).

Third, the appeals court "concluded that Moore's record of academic failure, . . . childhood abuse[,] and suffering . . . detracted from a determination that his intellectual

and adaptive deficits were related." 581 U. S., at ___ (slip op., at 13). But "in the medical community," those "traumatic experiences" are considered "'*risk factors*' *for* intellectual disability." *Ibid.* (quoting AAIDD–11, at 59–60).

Fourth, the Texas Court of Criminal Appeals required "Moore to show that his adaptive deficits were not related to 'a personality disorder.'" 581 U. S., at ___ (slip op., at 14) (quoting *Ex parte Moore I*, 470 S. W. 3d, at 488). But clinicians recognize that the "existence of a personality disorder or mental-health issue . . . is 'not evidence that a person does not also have intellectual disability.'" 581 U. S., at ___ (slip op., at 14) (quoting Brief for American Psychological Association et al. as *Amici Curiae* in *Moore* v. *Texas*, O. T. 2016, No. 15–797, p. 19).

Fifth, the appeals court directed state courts, when examining adaptive deficits, to rely upon certain factors set forth in a Texas case called *Ex parte Briseno*, 135 S. W. 3d 1 (Tex. Crim. App. 2004). *Ex parte Moore I*, 470 S. W. 3d, at 486, 489. The *Briseno* factors were: whether "those who knew the person best during the developmental stage" thought of him as "mentally retarded"; whether he could "formulat[e] plans" and "car[ry] them through"; whether his conduct showed "leadership"; whether he showed a "rational and appropriate" "response to external stimuli"; whether he could answer questions "coherently" and "rationally"; whether he could "hide facts or lie effectively"; and whether the commission of his offense required "forethought, planning, and complex execution of purpose." 135 S. W. 3d, at 8–9.

We criticized the use of these factors both because they had no grounding in prevailing medical practice, and because they invited "lay perceptions of intellectual disability" and "lay stereotypes" to guide assessment of intellectual disability. *Moore*, 581 U. S., at ___ (slip op., at 15). Emphasizing the *Briseno* factors over clinical factors, we said, "'creat[es] an unacceptable risk that persons with

intellectual disability will be executed.'" 581 U. S., at \_\_\_ (slip op., at 14) (quoting *Hall* v. *Florida*, 572 U. S. 701, 704 (2014)). While our decisions in "*Atkins* and *Hall* left to the States 'the task of developing appropriate ways to enforce' the restriction on executing the intellectually disabled," 581 U. S., at \_\_\_ (slip op., at 9) (quoting *Hall*, 572 U. S., at 719), a court's intellectual disability determination "must be 'informed by the medical community's diagnostic framework,'" 581 U. S., at \_\_\_ (slip op., at 9) (quoting *Hall*, 572 U. S., at 721).

Three Members of this Court dissented from the majority's treatment of Moore's intellectual functioning and with aspects of its adaptive-functioning analysis, but all agreed about the impropriety of the *Briseno* factors. As THE CHIEF JUSTICE wrote in his dissenting opinion, the *Briseno* factors were "an unacceptable method of enforcing the guarantee of *Atkins"* and the Texas Court of Criminal Appeals "therefore erred in using them to analyze adaptive deficits." *Moore*, 581 U. S., at \_\_\_ (opinion of ROBERTS, C. J.) (slip op., at 1).

For the reasons we have described, the Court set aside the judgment of the appeals court and remanded the case "for further proceedings not inconsistent with this opinion." *Id.*, at \_\_\_ (slip op., at 18).

II

On remand the Texas Court of Criminal Appeals reconsidered the appeal and reached the same basic conclusion, namely, that Moore had not demonstrated intellectual disability. *Ex parte Moore II*, 548 S. W. 3d, at 555. The court again noted the three basic criteria: intellectual-functioning deficits, adaptive deficits, and early onset. *Id.*, at 560–562. But this time it focused almost exclusively on the second criterion, adaptive deficits. The court said that, in doing so, it would "abandon reliance on the *Briseno* evidentiary factors." *Id.*, at 560. It would instead

use "'current medical diagnostic standards'" set forth in
the American Psychiatric Association's DSM–5. *Id.*, at
559–560. In applying those standards to the trial court
record, it found the State's expert witness, Dr. Kristi
Compton, "'far more credible and reliable'" than the other
experts considered by the trial court. *Id.*, at 562. (As in
our last opinion, we neither second nor second-guess that
judgment.) And, as we have said, it reached the same
conclusion it had before.

Moore has now filed a petition for certiorari in which he
argues that the trial court record demonstrates his intel-
lectual disability. He asks us to reverse the appeals
court's contrary holding. Pet. for Cert. 2. The prosecutor,
the district attorney of Harris County, "agrees with the
petitioner that he is intellectually disabled and cannot be
executed." Brief in Opposition 9. The American Psycho-
logical Association (APA), American Bar Association
(ABA), and various individuals have also filed *amicus
curiae* briefs supporting the position of Moore and the
prosecutor. Brief for APA et al. as *Amici Curiae*; Brief for
ABA as *Amicus Curiae*; Brief for Donald B. Ayer et al. as
*Amici Curiae*. The Attorney General of Texas, however,
has filed a motion for leave to intervene, and asks us to
deny Moore's petition. Motion for Leave to Intervene as a
Respondent.

## III

After reviewing the trial court record and the court of
appeals' opinion, we agree with Moore that the appeals
court's determination is inconsistent with our opinion in
*Moore*. We have found in its opinion too many instances
in which, with small variations, it repeats the analysis we
previously found wanting, and these same parts are criti-
cal to its ultimate conclusion.

For one thing, the court of appeals again relied less
upon the adaptive *deficits* to which the trial court had

referred than upon Moore's apparent adaptive *strengths*. See *Moore*, 581 U. S., at ___ (slip op., at 12) (criticizing the appeals court's "overemphas[is]" upon Moore's "perceived adaptive strengths"); *supra*, at 3. The appeals court's discussion of Moore's "[c]ommunication [s]kills" does not discuss the evidence relied upon by the trial court. *Ex parte Moore II*, 548 S. W. 3d, at 563–565. That evidence includes the young Moore's inability to understand and answer family members, even a failure on occasion to respond to his own name. App. to Pet. for Cert. 289a–290a. Its review of Moore's "[r]eading and [w]riting" refers to deficits only in observing that "in prison, [Moore] progressed from being illiterate to being able to write at a seventh-grade level." *Ex parte Moore II*, 548 S. W. 3d, at 565. But the trial court heard, among other things, evidence that in school Moore was made to draw pictures when other children were reading, and that by sixth grade Moore struggled to read at a second-grade level. App. to Pet. for Cert. 290a, 295a.

Instead, the appeals court emphasized Moore's capacity to communicate, read, and write based in part on *pro se* papers Moore filed in court. *Ex parte Moore II*, 548 S. W. 3d, at 565–566. That evidence is relevant, but it lacks convincing strength without a determination about whether Moore wrote the papers on his own, a finding that the court of appeals declined to make. Rather, the court dismissed the possibility of outside help: Even if other inmates "composed" these papers, it said, Moore's "ability to copy such documents by hand" was "within the realm of only a few intellectually disabled people." *Id.*, at 565. Similarly, the court of appeals stressed Moore's "coherent" testimony in various proceedings, but acknowledged that Moore had "a lawyer to coach him" in all but one. *Id.*, at 564, and n. 95. As for that *pro se* hearing, the court observed that Moore read letters into the record "without any apparent difficulty." *Ibid.*

For another thing, the court of appeals relied heavily upon adaptive improvements made in prison. See *Moore*, 581 U. S., at ___ (slip op., at 13) ("caution[ing] against reliance on adaptive strengths developed" in "prison"); *supra*, at 3. It concluded that Moore has command of elementary math, but its examples concern trips to the prison commissary, commissary purchases, and the like. *Ex parte Moore II*, 548 S. W. 3d, at 566–569. It determined that Moore had shown leadership ability in prison by refusing, on occasion, "to mop up some spilled oatmeal," shave, get a haircut, or sit down. *Id.*, at 570–571, and n. 149. And as we have said, it stressed correspondence written in prison. *Id.*, at 565. The length and detail of the court's discussion on these points is difficult to square with our caution against relying on prison-based development.

Further, the court of appeals concluded that Moore failed to show that the "cause of [his] deficient social behavior was related to any deficits in general mental abilities" rather than "emotional problems." *Id.*, at 570. But in our last review, we said that the court of appeals had "departed from clinical practice" when it required Moore to prove that his "problems in kindergarten" stemmed from his intellectual disability, rather than "'emotional problems.'" *Moore*, 581 U. S., at ___ (slip op., at 14) (quoting *Ex parte Moore I*, 470 S. W. 3d, at 488, 526)). And we pointed to an *amicus* brief in which the APA explained that a personality disorder or mental-health issue is "not evidence that a person does not also have intellectual disability." 581 U. S., at ___ (slip op., at 14) (quoting Brief for APA et al. as *Amici Curiae* in No. 15–797, at 19).

Finally, despite the court of appeals' statement that it would "abandon reliance on the *Briseno* evidentiary factors," *Ex parte Moore II*, 548 S. W. 3d, at 560, it seems to have used many of those factors in reaching its conclusion. See *supra*, at 4 (detailing those factors). Thus, *Briseno*

asked whether the "offense require[d] forethought, plan-ning, and complex execution of purpose." 135 S. W. 3d, at 9. The court of appeals wrote that Moore's crime required "a level of planning and forethought." *Ex parte Moore II*, 548 S. W. 3d, at 572, 603 (observing that Moore "w[ore] a wig, conceal[ed] the weapon, and fle[d]" after the crime).

*Briseno* asked whether the defendant could "respond coherently, rationally, and on point to oral and written questions." 135 S. W. 3d, at 8. The court of appeals found that Moore "responded rationally and coherently to ques-tions." *Ex parte Moore II*, 548 S. W. 3d, at 564.

And *Briseno* asked whether the defendant's "conduct show[s] leadership or . . . that he is led around by others." 135 S. W. 3d, at 8. The court of appeals wrote that Moore's "refus[al] to mop up some spilled oatmeal" (and other such behavior) showed that he "influences others and stands up to authority." *Ex parte Moore II*, 548 S. W. 3d, at 570–571.

Of course, clinicians also ask questions to which the court of appeals' statements might be relevant. See AAIDD–11, at 44 (noting that how a person "follows rules" and "obeys laws" can bear on assessment of her social skills). But the similarity of language and content be-tween *Briseno*'s factors and the court of appeals' state-ments suggests that *Briseno* continues to "pervasively infec[t] the [the appeals courts'] analysis." *Moore*, 581 U. S., at \_\_\_ (slip op., at 18).

To be sure, the court of appeals opinion is not identical to the opinion we considered in *Moore*. There are sentences here and there suggesting other modes of analysis con-sistent with what we said. But there are also sentences here and there suggesting reliance upon what we earlier called "lay stereotypes of the intellectually disabled." *Id.*, at \_\_\_ (slip op., at 15). Compare *Ex parte Moore II*, 548 S. W. 3d, at 570–571 (finding evidence that Moore "had a girlfriend" and a job as tending to show he lacks intellec-

Per Curiam

tual disability), with AAIDD–11, at 151 (criticizing the "incorrect stereotypes" that persons with intellectual disability "never have friends, jobs, spouses, or children"), and Brief for APA et al. as *Amici Curiae* 8 ("[I]t is estimated that between nine and forty percent of persons with intellectual disability have some form of paid employment").

We conclude that the appeals court's opinion, when taken as a whole and when read in the light both of our prior opinion and the trial court record, rests upon analysis too much of which too closely resembles what we previously found improper. And extricating that analysis from the opinion leaves too little that might warrant reaching a different conclusion than did the trial court. We consequently agree with Moore and the prosecutor that, on the basis of the trial court record, Moore has shown he is a person with intellectual disability.

\* \* \*

The petition for certiorari is granted. The Attorney General of Texas' motion to intervene is denied; we have considered that filing as an *amicus* brief. The judgment of the Texas Court of Criminal Appeals is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

### BOBBY JAMES MOORE *v.* TEXAS

#### ON PETITION FOR WRIT OF CERTIORARI TO THE COURT OF CRIMINAL APPEALS OF TEXAS

No. 18–443.   Decided February 19, 2019

CHIEF JUSTICE ROBERTS, concurring.

When this case was before us two years ago, I wrote in dissent that the majority's articulation of how courts should enforce the requirements of *Atkins* v. *Virginia*, 536 U. S. 304 (2002), lacked clarity. *Moore* v. *Texas*, 581 U. S. \_\_\_, \_\_\_–\_\_\_ (2017) (slip op., at 10–11). It still does. But putting aside the difficulties of applying *Moore* in other cases, it is easy to see that the Texas Court of Criminal Appeals misapplied it here. On remand, the court repeated the same errors that this Court previously condemned—if not quite *in haec verba*, certainly in substance. The court repeated its improper reliance on the factors articulated in *Ex parte Briseno*, 135 S. W. 3d 1, 8 (Tex. Crim. App. 2004), and again emphasized Moore's adaptive strengths rather than his deficits. That did not pass muster under this Court's analysis last time. It still doesn't. For those reasons, I join the Court's opinion reversing the judgment below.

# SUPREME COURT OF THE UNITED STATES

## BOBBY JAMES MOORE *v.* TEXAS

### ON PETITION FOR WRIT OF CERTIORARI TO THE COURT OF CRIMINAL APPEALS OF TEXAS

No. 18–443.   Decided February 19, 2019

JUSTICE ALITO, with whom JUSTICE THOMAS and JUSTICE GORSUCH join, dissenting.

Two years ago, this Court vacated a judgment of the Texas Court of Criminal Appeals holding that Bobby James Moore was not intellectually disabled and was therefore eligible for the death penalty. *Moore* v. *Texas*, 581 U. S. ___ (2017). While the Court divided on the appropriate disposition, both the majority and the dissent agreed that the Court of Criminal Appeals should have assessed Moore's claim of intellectual disability under contemporary standards rather than applying the outdated evidentiary factors laid out in *Ex parte Briseno*, 135 S. W. 3d 1, 8 (Tex. Crim. App. 2004). *Moore*, 581 U. S., at ___ (slip op., at 2); *id.*, at ___ (ROBERTS, C. J., dissenting) (slip op., at 1). On remand, the Court of Criminal Appeals adopted the leading contemporary clinical standards for assessing intellectual disability, applied those standards to the record, and once again determined that Moore is eligible for the death penalty. *Ex parte Moore*, 548 S. W. 3d 552, 555 (2018).

Today, the Court reverses that most recent decision, holding that the Court of Criminal Appeals failed to follow our decision in *Moore*. Such a failure would be understandable given the "lack of guidance [*Moore*] offers to States seeking to enforce the holding of *Atkins*." *Moore*, 581 U. S., at ___ (ROBERTS, C. J., dissenting) (slip op., at 10). Indeed, each of the errors that the majority ascribes to the state court's decision is traceable to *Moore*'s failure to provide a clear rule. For example, the majority faults

the Court of Criminal Appeals for "rel[ying] less upon the
adaptive *deficits* . . . than upon Moore's apparent adaptive
*strengths*," *ante*, at 6–7, and for "rel[ying] heavily upon
adaptive improvements made in prison," *ante*, at 8.  But in
*Moore*, we said only that a court ought not "overempha-
siz[e]" adaptive strengths or place too much "stres[s]" on
improved behavior in prison.  This left "the line between
the permissible—consideration, maybe even emphasis—
and the forbidden—'overemphasis'—. . . not only thin, but
totally  undefined  . . . ."    *Moore*,  581  U. S.,  at  ___
(ROBERTS, C. J., dissenting) (slip op., at 11).  The major-
ity's belief that the state court failed to follow *Moore* on
remand merely proves that "[n]either the Court's articula-
tion of this standard [in *Moore*] nor its application sheds
any light on what it means."  *Id.*, at ___ (ROBERTS, C. J.,
dissenting) (slip op., at 10).

Having concluded that the Court of Criminal Appeals
failed to apply the standard allegedly set out in *Moore*, the
Court today takes it upon itself to correct these factual
findings and reverse the judgment.*  This is not our role.
"We do not grant a certiorari to review evidence and dis-
cuss specific facts."  *United States* v. *Johnston*, 268 U. S.
220, 227 (1925); see also *Salazar-Limon* v. *Houston*, 581
U. S. ___, ___ (2017) (ALITO, J., concurring in denial of
certiorari) (slip op., at 2) ("[W]e rarely grant review where
the thrust of the claim is that a lower court simply erred
in applying a settled rule of law to the facts of a particular
case").  If the Court is convinced that the Court of Crimi-
nal Appeals made a legal error, it should vacate the judg-

---

*The Court excuses its usurpation of the factfinding role by con-
trasting the conclusions of "the trial court," *ante*, at 6–7, 10, with the
views of "the court of appeals," *ante*, at 7–9.  But in Texas habeas
proceedings, the Texas Court of Criminal Appeals is "the ultimate
factfinder" and has authority to accept, alter, or reject the "recommen-
dation" of the habeas court.  *Ex parte Reed*, 271 S. W. 3d 698, 727
(2008).

ment below, pronounce the standard that we failed to provide in *Moore*, and remand for the state court to apply that standard. The Court's decision, instead, to issue a summary reversal belies our role as "a court of review, not of first view." *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005).

The Court's foray into factfinding is an unsound departure from our usual practice. The error in this litigation was not the state court's decision on remand but our own failure to provide a coherent rule of decision in *Moore*. I would deny the petition for a writ of certiorari. I certainly would not summarily reverse and make our own finding of fact without even giving the State the opportunity to brief and argue the question. I therefore respectfully dissent.